UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Kelly Jean Ritt,

Petitioner,

vs. REPORT AND RECOMMENDATION

Lynn Dingle, Mike Hatch,

Respondents. Civ. No. 00-2023 (ADM/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 3rd day of April, 2001.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, which alleges that she is incarcerated in violation of the Constitution, Laws, or Treaties of the United States. See, Title 28 U.S.C. §2254(a).

The Petitioner has appeared pro se, and the Respondent has appeared by Scott A. Hersey, and Lawrence F. Clark, Assistant Dakota County Attorneys.

For reasons which follow, we recommend that the Petition for Habeas Corpus be denied.

FILED APR - 3 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. Factual and Procedural History

The Petitioner is currently serving a life sentence of imprisonment, at the Minnesota Correctional Facility -- Shakopee, Minnesota ("MCF-Shakopee"), which was imposed by the Dakota County District Court, on October 18, 1997. The Petitioner was sentenced following a conviction for two Counts of Murder in the First Degree (premeditated; while committing arson in the first degree), two Counts of Murder in the Second Degree (intentional; while committing a felony), Murder in the Third Degree (depraved mind), and Arson in the First Degree, in violation of Minnesota Statutes Sections 609.185(1), 609.185(3), 609.19, Subdivision 1(1), 609.19, Subdivision 2(1), 609.105(a), and 609.561, Subdivision 1.

Hannah Jean Ritt ("Hannah"), was born on April 5, 1995. She was the third child of the Petitioner and Brian Ritt.[1] Although the Petitioner's pregnancy appeared normal, at the time of her birth, Hannah was diagnosed with cytomegalovirus (CMV), a virus that affected her heart, liver, spleen, eyesight, hearing, and brain. Hannah's condition led to a variety of birth complications, including breathing difficulties, neurological problems, and a reduced heart rate. Eventually, Hannah's condition stabilized, how-

---

[1]At the time of Hannah's birth, the Petitioner had an eight year old daughter, K.R., and a five year old son, G.R. Also, the Petitioner gave birth to another son, J.R., 10 months after Hannah was born.

ever, because of the CMV, she was unable to eat without experiencing reflux, and therefore, she required four to six feedings of liquid formula each day through a gastrostomy tube. In order to avoid infection, this tube had to be cleaned daily.

In addition to her eating difficulties, Hannah was deaf, and developmentally delayed. Also, because of her young age, at the time of her death, the extent to which Hannah would experience long term mental deficiencies from the CMV was unknown. During her short life span, Hannah required the assistance of a host of health professionals in order to care of her daily needs, including doctors, public health nurses, a physical therapist, a speech therapist, a sign language teacher, and in-home personal care attendants.

At the Petitioner's Trial, the state presented testimony from a variety of individuals and acquaintances who were associated with the Petitioner. Many of these individuals testified that there were numerous occasions when the Petitioner had indicated that she was suffering from severe stress and anxiety as a result of having to care for Hannah. In addition, a variety of individuals testified that the Petitioner had verbally indicated to them her desire that Hannah would die, or that Hannah had never been born. Several individuals also testified that the Petitioner had inquired, several times, as to whether they would be interested in adopting

Hannah. During many of these instances, the Petitioner indicated that, although she was willing to give up custody of Hannah, she could not, because of her husband's disapproval. Finally, the State presented testimony from several individuals who testified that the Petitioner had inquired as to potential dangers of space heaters, and whether a fire could be caused by placing a blanket over a space heater.

On March 25, 1997, police were dispatched to the Ritt residence after receiving a report of a structural fire. When the police arrived at the scene, they encountered the Petitioner, who informed them that Hannah remained in the burning premises. Upon their receipt of this information, several officers attempted to reach Hannah, but these efforts failed because of the extreme heat, and intense smoke, inside the residence. Eventually, fire department personnel arrived on the scene, and were able to spray water on the fire, in order that Hannah could be reached. However, by the time Hannah was retrieved from the residence, she had died.

After the fire had been extinguished, the Fire Marshal, who was in charge of investigating the fire, began an extensive inquiry. Eventually, the Fire Marshal determined that the fire had originated from either the front of an electric space heater, which was located next to Hannah's crib, or from the floor level in front of the heater. The Fire Marshal also concluded that the fire had

been intentionally set by a human being. Among his other findings, the Fire Marshal noted that the front grille of the space heater had melted from the heat of the fire, and that a pattern of hard crusty ash material was found on top of the space heater, and on the floor near the heater. The Fire Marshal testified that, in his experience, synthetic fabrics, such as those found in knitted or woven products such as afghans, would produce a checkerboard, or woven-type pattern of crusty, hard ash, such as that which was discovered on top of, and around, the charred space heater.

The Fire Marshal also testified that, during a post-fire interview, the Petitioner had informed him that smoking was not allowed in Hannah's room, and was confined solely to the kitchen of the Ritt residence. According to the Fire Marshal, there was no evidence of any matches, lighters, cigarettes or ashtrays in any rooms located within the Ritt residence, besides the kitchen. Further, although no evidence of accelerants was detected, either in the air, or on the carpet in Hannah's room, the Fire Marshal testified that this did not eliminate the possibility that accelerants were used to facilitate the fire, because many flammable chemicals would evaporate quickly during a fire, thereby making their presence undetectable afterwards.

At Trial, over a standing objection by the defense, the State presented four videotaped test burns involving an afghan and a

space heater. The Minnesota Supreme Court explained these tests, and their results, as follows:

> [The] * * * four videotaped test burns * * * were played for the jury during the testimony of the state's electrical expert witness. The court gave a cautionary instruction to the jury that the videotapes were "offered solely to demonstrate the scientific principles which may serve as a basis for this expert's opinion" and were "not offered to recreate the fire that allegedly occurred at the Ritt home." The test burns involved a heater similar to the one found in the Ritt home set to its maximum wattage for the duration of each of the four test burns. The first two tests involved an afghan taken from J.R.'s bed which was described by Doffing and the Ritts as similar to Hannah's.
>
> For the first test J.R.'s afghan was draped over the exemplar heater for 80 minutes, the maximum length of time the afghan could have been on the heater on the evening of the fire. The afghan browned slightly but did not burn and there was no damage to the grille of the heater or the carpet underneath. The second test involved bunching up the afghan in front of the heater in an attempt to increase the heat to the grille. Those who were present for the second test were driven out of the room after about 15 minutes because of the acrid choking fumes emitted by the afghan. The afghan charred and pulled away from the heater, but the heater grille did not melt. A test was also conducted on a piece of carpet taken from Hannah's bedroom and was ignited with a propane torch, but the fire extinguished when the torch was removed.
>
> The state's expert concluded from the first two test burns that the fire in the Ritt home involved an outside source of ignition and an accelerant because he could not duplicate the

> damage to the grille and the carpet with the burning afghan alone, so follow-up tests were conducted. In the third test burn an acrylic afghan was draped over the exemplar heater and a low shelf to recreate the location of the daybed, and the afghan was ignited in two places by a paper match. The grille did not melt and although the top layer of the carpet was charred, the carpet did not burn through to the floor, as occurred in the fatal fire. For the fourth and final test burn the afghan was draped over the heater and between one pint and one quart of acetone was poured onto the afghan, heater and underlying carpet. The afghan was then ignited with a propane lighter. The heater grille melted and the carpet burned through in a manner similar to the scene of the fire.

State v. Ritt, 599 N.W.2d 802, 805-806 (Minn. 1999).[2]

Several days after the fire, on April 1, 1997, Detective James Rgnonti ("Rgnonti") of the Hastings Police Department interviewed the Petitioner at the Hastings Police Station.[3] Prior to the

---

[2]As noted by the Minnesota Supreme Court:

> J.R.'s afghan was determined to be 100% acrylic, which when burned produces a hard crusty ash. A textile flammability expert testified that the ash found around the heater in the Ritt home was inconsistent with any fiber material other than acrylic, and that it was "virtually impossible to ignite acrylic fibers from a smoldering heat source, such as a cigarette" because acrylic gets larger when heated and forms a hard char of carbon which is resistant to fire and flame.

State v. Ritt, 599 N.W.2d 802, 806 n. 7 (Minn. 1999).

[3]On that same date, the Petitioner's daughter, K.R., spoke with Rgnonti and a fellow officer. During the interview, K.R. in-
(continued...)

interview, Rgnonti informed the Petitioner's family that he wanted to conduct an interview and, thereafter, the Petitioner had contacted him to schedule the interview at a time that was convenient for her. The interview was ultimately conducted in Rgnonti's office in the administrative section of the police building. As explained by the Minnesota Supreme Court:

> Rgnonti was not in uniform during the interrogation and was not carrying his service weapon. The door was closed because there was a broadcast speaker just outside his office that was sometimes noisy. Rgnonti testified at length about the interview and a videotape of both the interview and formal statement were played for the jury.
>
> Initially, Rgnonti informed [the Petitioner] that "nobody [was] under any type of arrest at

[3](...continued) formed Rgnonti that, shortly after she was awakened by her mother on the night of the fire, she was led past Hannah's room, where she observed Hannah at the foot of her crib with her arms outstretched. K.R. also informed Rgnonti that she was able to observe Hannah at this time because the door to Hannah's bedroom was "wide open". According to K.R., although there were some flames present in the room at the time, she did not feel very much heat, and did not observe very much smoke.

In addition, at Trial, David Ritt's brother, Brian Ritt, testified that, on April 2, 1997, K.R. informed him that, on the night of the fire, she was awoken by the Petitioner. After she was awoken, K.R. told Brian Ritt that she found the Petitioner standing slightly inside Hannah's doorway. Apparently, at that time there were some flames, and a small amount of smoke within Hannah's room. However, K.R. explained that, after she saw Hannah standing in her crib, the Petitioner closed the door, and told her to go find her brother.

> all" and she was free to go when they had finished talking.

Id. at 806.

During the interview with Rgnonti, the Petitioner stated that, on the night of the fire, she was asleep with J.R., and G.R., when she was awoken by a smoke alarm.

Almost immediately after waking, the Petitioner testified that she heard Hannah utter a single scream. The Petitioner then proceeded to Hannah's room. According to the Petitioner, at that time, she was unable to enter the room. However, the door to Hannah's room was slightly ajar, and the Petitioner stated that she was able to open it further, and observe Hannah's crib, surrounded by flames and a significant amount of smoke. The Petitioner also stated that, although she could not see Hannah, she had the feeling that Hannah was standing in her crib. The Petitioner explained that she then ran to the kitchen and called 911. Thereafter, she sent her other children to a neighbor's house, and returned to Hannah's room. However, according to the Petitioner, she was unable to enter the room because she had difficulty pushing the door open, and because she had difficulty breathing due to the smoke. Eventually, the Petitioner ran outside of the residence to get some fresh air, and flagged down the police officers who were arriving on the scene.

During the interview, the Petitioner also told Rgnonti that Hannah had recently begun to throw things out of her crib. The Petitioner explained that, prior to the fire, Hannah had thrown her afghan onto the space heater several times, but that it had never started on fire. At this point in the interview, the Petitioner's story began to waiver, as the Minnesota Supreme Court explained:

> Ritt's account of the fire changed over the course of her interview with Rgnonti. Rgnonti expressed doubt about Hannah's ability to throw the afghan as far as the space heater and asked Ritt whether she had gone in to check on Hannah and remove the afghan. Ritt eventually admitted that she went into Hannah's room prior to the fire and took the afghan off Hannah. She tossed the afghan toward the daybed and stated that it "probably" landed partially on the heater. Ritt denied placing the afghan on the heater "on purpose," but that she might have done so "on hope," and that sometimes she wished that God would decide to take Hannah. She repeated her assertion that she attempted to enter Hannah's room to save her but was prevented by the choking smoke.
>
> Following her interview Ritt was read her Miranda rights and agreed to give a formal statement to Rgnonti about the night of the fire. She repeated the substance of her earlier interview stating that she removed the afghan from Hannah and threw it toward the daybed and thought it had landed partially on the heater. She stated that later when she heard the smoke alarm she thought "Look what I did now." Ritt continued to draw a distinction between what she wanted to happen and what she hoped might happen: for example, she stated that she did not intend for Hannah to die, yet she "hoped" that God would take her. Ritt eventually

> stated that she was sure part of the afghan landed on the heater but that she did not see it and could not understand how a space heater could cause a fire. At the end of the statement Ritt stated that she had given the statement freely and that she was not coerced. The videotape continued to record Rgnonti and his supervisor telling Ritt that they were going to charge her with Hannah's death and allowing her to call her husband to come down to the police station.

Id. at 806-807.[4]

At Trial, the State theorized that the Petitioner had started the fire by draping an afghan over the heater, pouring nail polish remover onto the afghan, and igniting it.

---

[4]At Trial, Rgnonti admitted, on cross-examination, that he had been trained in the Inbau, Reid & Buckley interrogation technique. The "Reid technique", as it is sometimes known, involves the use of trickery and deception by police in obtaining confessions. See, Commentary to §140.4 of the Model Code of Pre-Arraignment Procedure (1975). This deception may include incidents such as:

> [S]eeking to offset the suspect's reluctance to incriminate himself by displays of apparent sympathy, friendship, or moral indignation. It may consist of misrepresentations which make the case against him appear stronger than it is or which understate the seriousness of his situation. It may consist of misstating the suspect's legal position by statements relating either to the substantive crime or his procedural rights. It may involve the use of persons appearing to be in a special confidential relationship with the suspect for the purpose of eliciting statements which he would not make to the police. Or it may involve eavesdropping, or the use of undercover operators or informers.

State v. Thaggard, 527 N.W.2d 804, 808 (Minn. 1995).

In contrast, the defense contended that the fire had been caused by a lit cigarette, which had ignited the mattress of the daybed. After the presentation of the evidence, and the testimony of a variety of expert witnesses, the Jury began its deliberations. Within a few hours, the Jury requested leave to view the videotapes of the Petitioner's interview with Rgnonti, and her formal statement. This request was granted by the Court, without objection from either the prosecution, or the defense. Ultimately, after deliberating for two days, the Jury returned a Verdict, finding the Petitioner guilty of two Counts of Murder in the First Degree, two Counts of Murder in the Second Degree, one Count of Murder in the Third Degree, and Arson in the First Degree.

Following her conviction, the Petitioner appealed to the Minnesota Supreme Court, on two grounds: (1) that the Trial Court erred when it denied her pretrial Motion to suppress her statement to Rgnonti, because it was involuntary; and, (2) that the Trial Court erred when it excluded the testimony of a defense expert witness, who testified about the reliability of the Reid technique of interrogation. The Minnesota Supreme Court rejected the Petitioner's contentions in a published decision that was filed on August 5, 1999. See, State v. Ritt, 599 N.W.2d 802 (Minn. 1999).

On August 25, 2000, the Petitioner filed her Petition for Writ of Habeas Corpus, in which she seeks to overturn her original

conviction, based on arguments similar to those that were raised in her State Court appeal. Specifically, the Petitioner argues that her Fifth Amendment rights were violated when the Trial Court allowed her confession into evidence, which she argues was psychologically coerced, and that her Sixth and Fourteenth Amendments were violated when the Trial Court refused to allow a defense expert to testify about the coercive nature of the Reid technique of interrogation. In opposition, the Respondent contends that the Petitioner's conviction was proper, because her statements were voluntary, under the totality of the circumstances, and because the Trial Court did not abuse its discretion when it refused to allow the Petitioner's expert to testify. As we subsequently detail, we agree with the Respondent, and recommend that the Petition for a Writ of Habeas Corpus be denied.

## III. Discussion

### A. Voluntariness of the Petitioner's Statement to Rgnonti.

1. Standard of Review. As noted, the Petitioner contends that the Trial Court erred when it admitted her statement into evidence because, in her view, the statement was the product of a psychologically coercive interrogation known as the "Reid technique." "[A] district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that [she] is

in custody in violation of the Constitution or laws or treaties of the United States." Title 28 U.S.C. §2254(a). Thus, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Accordingly, before a Writ may issue, the Petitioner must establish that the State's exercise of custody over her person is an affront to the Constitution, a Federal law, or a Federal treaty. Pruett v. Norris, 153 F.3d 579, 582 (8th Cir. 1998); Robinson v. Leapley, 26 F.3d 826, 829 (8th Cir 1994); Maynard v. Lockhart, 981 F.2d 981, 986 (8th Cir. 1992); Garcia v. Powers, 973 F.2d 684, 685 (8th Cir. 1992).

Congress has recently restricted the scope of a Federal Court's review of Habeas Petitions, whose underlying claims have been adjudicated in a State Court. See, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). A Federal District Court's authority to vitiate State Court decisions, by the granting of a Writ of Habeas Corpus, is now limited to the narrow class of claims which have exhausted all State Court remedies, and which involve an adjudication that either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as deter-

> mined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d); see also, Williams v. Taylor, --- U.S. ---, 120 S.Ct. 1495 (2000); Thiel v. Schutzle, 200 F.3d 1120, 1122 (8th Cir. 1999).

In Lindh v. Murphy, 96 F.3d 856, 870 (7th Cir. 1996), rev'd on other grounds, 521 U.S. 320 (1997), the Seventh Circuit stated, "a reasonable decision by the state court must be honored." Id. at 871. Thus, where a petitioner challenges a State Court's application of law to fact, relief is possible only where no reasonable Jurist would view the State Court's ruling as correct. See, Jackson v. Johnson, 150 F.3d 520, 523 (5th Cir. 1998). Since "Section 2254(d)(1) requires federal courts to take into account the care with which the State Court considered the subject," a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." Lindh v. Murphy, supra at 869. As stated in Lindh, a State Court decision, which is within the bounds of what the Supreme Court has determined to be reasonable, must be respected, "not because it is right, * * * but because the grave remedy of upsetting a judgment entered by another judicial system after full litigation is reserved for grave occasions." Id. at 871.

2. Legal Analysis.

a. Voluntariness of the Petitioner's Confession. We have carefully reviewed the substance of the Minnesota Supreme Court's resolution of Petitioner's challenge to her confession, and we cannot responsibly conclude that its decision was unreasonable, given the evidence presented at the Petitioner's Trial.

"The Self-Incrimination Clause of the Fifth Amendment guarantees that no person 'shall be compelled in any criminal case to be a witness against himself.'" Withrow v. Williams, 507 U.S. 680, 688 (1993), citing U.S. Constitution, Amendment 5. The Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. U.S., --- U.S. ---,120 S.Ct. 2326, 2330 (2000), citing, Bram v. United States, 168 U.S. 532, 542 (1897)(stating that the voluntariness test "is controlled by that portion of the Fifth Amendment * * * commanding that no person 'shall be compelled in any criminal case to be a witness against himself'"); Brown v. Mississippi, 297 U.S. 278 (1936)(reversing a criminal conviction under the Due Process Clause because it was based upon a confession obtained by physical coercion).

For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circum-

stances surrounding the giving of a confession." Dickerson v. U.S., supra at 2331, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). As the Supreme Court recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. at 226; see also, Haynes v. Washington, 373 U.S. 503 (1963); Gallegos v. Colorado, 370 U.S. 49, 55 (1962); Reck v. Pate, 367 U.S. 433, 440 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, 324 U.S. 401, 404 (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, 346 U.S. 156, 185 (1953).

Dickerson v. U.S., supra at 2331.

Among the circumstances to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, Id. (noting that, under Miranda v. Arizona, 384 U.S. 436 (1966), the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings: that a suspect has the right to remain silent, that anything he says can be used against him in a Court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires); any elements of

"police coercion, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); its location, see, Reck v. Pate, 367 U.S. 433, 441 (1961); its continuity, Leyra v. Denno, 347 U.S. 556, 561 (1954); the defendant's maturity, Haley v. Ohio, 332 U.S. 596, 599-6011(1948)(opinion of Douglas, J.); education, Clewis v. Texas, 386 U.S. 707, 712 (1967); physical condition, Greenwald v. Wisconsin, 390 U.S. 519, 520-521 (1968)(per curiam; and mental health, Fikes v. Alabama, 352 U.S. 191, 196 (1957)." Withrow v. Williams, supra at 693.

As explained by the Minnesota Supreme Court, much of the evidence presented at Trial demonstrated that the Petitioner's statements to Rgnonti were voluntary. First, the Petitioner dictated the time at which her interview with Rgnonti would take place, and she was allowed to submit to the interview at a time that was convenient for her. Also, during the interview, Rgnonti was not in uniform, nor was he armed. Rather, the interview was conducted in an informal setting, i.e., Rgnonti's office. Further, although the Petitioner was not read her Miranda rights, she was informed that she was not under arrest, and that she would be free to leave at the conclusion of the interview. As noted by the Minnesota Supreme Court:

> [The Petitioner] was allowed to smoke freely even though the law enforcement center was a no-smoking facility, and Rgnonti left the room to get her a soft drink when she asked for one. [The Petitioner] gave no indication of being overly tired or under the influence of any medication and never indicated to Rgnonti that she was under any particular stress. She did not cry or break down emotionally, and when she spontaneously asked Rgnonti if she would still have been considered a suspect if she had cried, he told her yes.
>
> [The Petitioner] appeared to have the ability to accurately verbalize her feelings and made sure that Rgnonti did not overstate what she said. She disagreed with Rgnonti on certain points and repeatedly denied intentionally placing the blanket on the space heater in order to cause a fire. She asked a number of questions about her status as a suspect and wondered out loud whether the insurance company would pay for the damage caused by the fire. Following her formal statement [the Petitioner] was asked if she had spoken of her own free will. She answered yes. [The Petitioner] was allowed to call her husband, who came to the police station and was informed of [the Petitioner's] statement and arrest.

State v. Ritt, supra at 810.

The United States Supreme Court has clarified that, for a confession to be considered involuntary, a defendant's will must be overborne by the circumstances surrounding the giving of a confession. See, Dickerson v. U.S., supra at 2331. Here, the Minnesota Supreme Court expressly concluded that, when considering the totality of the circumstances, the Petitioner's will was not overborne prior to her confession. See, State v. Ritt, supra.

Notwithstanding the Minnesota Supreme Court's reasoning, the Petitioner contends that the Court's decision was not merely incorrect but, rather, was unreasonable, because of the Court's failure to consider the coercive effect of the Reid technique, in provoking the Petitioner's confession. Specifically, the Petitioner argues that the Court ignored the most troubling aspect of Rgnonti's interrogation, that is, his implicit threat against the Petitioner's children. We conclude, in view of the totality of the Record, that the interrogation methods employed by Rgnonti were intended to encourage the Petitioner to confess to her crimes. At one point during the interview, Rgnonti did impliedly suggest that, were the Petitioner not to confess, her children would become more significant suspects in law enforcement's investigation.[5] Given the stage of the investigation, we have no reason to believe, and none has been brought to our attention, that the implication suggested by Rgnonti was a falsehood. Although the Petitioner would have us totally supplant the judgment of the Minnesota Supreme Court, with one more charitable to her view, we are not at liberty to do so, at least under the circumstances presented here. As we have previ-

---

[5]During the Petitioner's interview, Rgnonti informed the Petitioner that her children were "under investigation." See, Petitioner's Memorandum; Attached Exhibit, at 75. A short time later, Rgnonti stated to the Petitioner, "someone did it * * * now do I look at [K.R.] or [G.R.]?" Id. at 79.

ously observed, our function as a reviewing Court is not to reweigh the evidence. See, United States v. Anderson, supra at 422. To the contrary, we must accord "great deference" to the Minnesota Supreme Court's decision. See, Ward v. Lockhart, supra at 846.

Here, the Petitioner has failed to demonstrate that the decision of the Minnesota Supreme Court was unreasonable, and therefore, that decision must be accepted. While our independent review of Rgnonti's interview of the Petitioner reveals some evidence of tension in the give-and-take between Rgnonti and the Petitioner, we are presented with no evidence that her will was overborne by the style of questioning Rgnonti employed. The questioning of witnesses to what may have been a crime is not an esoteric, academic exercise. As a result, the issue presented is not whether an academician would have employed a more accommodating tone, or would have phrased the questions more indulgently. The issue, rather, is whether the challenged questioning employed such a level of threats, intimidation, or trickery, as to have overcome the Defendant's will. We have not been presented with any such evidence. Accordingly, we are not persuaded that Rgnonti's interrogation of the Petitioner was so coercive as to render the Minnesota Supreme Court's resolution of the Fifth Amendment issue clearly untenable.

Rather, the Minnesota Supreme Court referenced a profusion of evidence to support its conclusion that the Petitioner's confession

was both a knowing and a voluntary act. The Petitioner's arguments to the contrary fail to convince us that the evidence, when viewed in a light most favorable to the State, is wholly insufficient to uphold the Court's finding that her statements were voluntary, and were not unconstitutionally obtained. As such, there is no basis for us to substitute our judgment for that of the Minnesota Supreme Court. We, therefore, recommend that the Petitioner's request for Habeas relief be denied, with respect to this aspect of her Petition.

b. Trial Court's Exclusion of the Expert Testimony of Dr. Ralph Underwager. As further support for her Habeas Petition, the Petitioner argues that the Trial Court violated the legal principles established by the Supreme Court in Crane v. Kentucky, 476 U.S. 683 (1986), when the Trial Court excluded the testimony of Dr. Ralph Underwager, that the Petitioner proffered.[6] At Trial,

[6]In her Memorandum, the Petitioner also contends that, because Rgnonti used a specialized psychological interrogation technique, the defense should not have been precluded from educating the Jury on that technique, at Trial. See, Petitioner's Memorandum, at 59, citing Ohler v. United States, --- U.S. ---, 120 S.Ct. 1851, 1853 (2000)(party waives objection to introduction of testimony on particular fact when that party introduces evidence of the same fact from his own witness). At Trial, however, the Petitioner failed to conclusively demonstrate that such a specialized technique had been employed by Rgnonti. Rgnonti specifically testified that his use of any specialized interrogation techniques, during his interview with the Petitioner, was minimal. Therefore, it does not appear that the Trial Court abused its discretion when it concluded that (continued...)

Dr. Underwager was expected to testify concerning the reliability and effect of the Reid technique, so as to undercut the significance of the statements that the Petitioner made during her interview with Rgnonti. In Ritt v. State, supra, the Minnesota Supreme Court explained the circumstances, which led to the exclusion of this testimony, as follows:

> [At Trial] [t]he defense submitted an offer of proof to the court and proposed to have Underwager take the jury through the videotape of [the Petitioner's] interview with Rgnonti to point out the use of specific interview techniques to illustrate how Rgnonti coerced Ritt into adopting certain statements. The court suppressed Underwager's testimony, stating:
>
> > [I]n this case the court makes a finding that the testimony would exceed the bounds of Rule 702, expert testimony. And under Rule 403 there's an extreme danger that it could confuse the jury. It appears to this court that this purported expertise does nothing more at this time than offer the gratuitous opinion of an expert with respect to the credibility of certain evidence that may be admitted here. And the jury would be in the best position to review all the video and the testimony - and the witnesses will be subject to cross-examination - on their own, without the assistance of

---

[6](...continued)
expert testimony, on this issue, would have been superfluous.

> an expert to make that [de]termination of credibility and does not * * * need an expert to do that.

State v. Ritt, supra at 810.

"The admission of expert testimony lies within the broad discretion of the district court and will not be disturbed absent an abuse of discretion." Giles v. Miners, Inc., --- F.3d ---, 2001 WL 237181, *1 (8th Cir. March 12, 2001), citing, Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296 (8th Cir. 1996); see also, State v. Miles, 585 N.W.2d 368, 371 (Minn. 1998).

This admissibility decision is governed primarily by Rule 702, Federal Rules of Evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[7]

Moreover, evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, Federal Rules of Evidence; see also, United States v. Davis, 154 F.3d 772, 780 (8th Cir.

[7]We note that Rule 702, Federal Rules of Civil Procedure, and Rule 702, of the Minnesota Rules of Evidence, are substantively identical.

1998), cert. denied, 119 S.Ct. 1072 (1999); United States v. Guerrero-Cortez, 110 F.3d 647, 652 (8th Cir. 1997); State v. Miles, supra at 371 (applying Rule 403, Minnesota Rules of Evidence, for this same principal). "'The rule is concerned only with unfair prejudice, that is, an undue tendency to suggest decision on an improper basis.'" United States v. Loveless, 139 F.3d 587, 592 (8th Cir. 1998), quoting United States v. Warfield, 97 F.3d 1014, 1027 (8th Cir. 1996), cert. denied, 520 U.S. 1110 (1997).

The purpose of expert testimony is to aid the Jury, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000), not supplant it, United States v. Shedlock, 62 F.3d 214, 219 (8th Cir. 1995). See also, Zimmer v. Miller Trucking, Co., 743 F.2d 601, 604 (8th Cir. 1984). "Expert testimony that does not add either 'precision or depth to the jury's ability to reach conclusions about [a] subject which is within their experience" does not meet the helpfulness test and the trial court is within its discretion to exclude it." State v. Ritt, supra at 810, citing State v. Helterbride, 301 N.W.2d 545, 547 (Minn. 1980).

In addressing this issue in State v. Ritt, supra at 801-812, the Minnesota Supreme Court reviewed the proposed testimony of Dr. Underwager, using these general precepts, and concluded that the Trial Court did not err when it determined that this testimony

would not have been helpful to the Jury. Once again, the Petitioner has failed to establish that this decision was unreasonable. Rather, the Petitioner relies upon Crane v. Kentucky, supra, to support her position, that the exclusion of Dr. Underwager's testimony violated clearly established Federal law. This argument was forcefully presented, and thoughtfully resolved, by the Minnesota Supreme Court, as follows:

> [The Petitioner] points to Crane v. Kentucky, 476 U.S. 683 (1986), for the principle that a defendant has a right to present "competent reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Id. at 690. The circumstances here are far different from those in Crane, however. In Crane, the trial court excluded evidence regarding the physical surroundings and circumstances of a confession by a 16-year old defendant alleged by the defense to have been "badgered" into confessing by as many as six police officers surrounding him during a lengthy unrecorded confinement in a windowless room. See id. at 685-86. The state's case against the defendant rested almost entirely on the unrecorded confession. See id. at 685. Here, [the Petitioner's] admission to Rgnonti that she hoped that Hannah would die was corroborated by several witnesses who testified that [the Petitioner] expressed the same hope to them. Further, [the Petitioner's] entire interview and formal statement were videotaped and the jury could observe the surrounding physical environment and circumstances.

State v. Ritt, supra at 811-812.

According to Petitioner, this analysis was unreasonable, because, although the facts surrounding the Petitioner's confession differ

from those attending the confession in Crane, its legal holding required the admission of Dr. Underwager's testimony. We disagree. We have reviewed the Supreme Court's discussion in Crane, and find that it fails to support the Petitioner's suggestion that expert testimony is always admissible to challenge the voluntariness of a confession. Moreover, in our considered view, the Minnesota Supreme Court faithfully applied the reasoning in Crane to the facts presented by the Petitioner's State Court appeal.

In Crane, the Supreme Court determined that a defendant's Due Process Rights were violated when the Trial Court refused to allow the defense to present **any** testimony bearing on the circumstances under which the confession was obtained. See, Crane v. Kentucky, supra at 685. Such testimony was particularly relevant in Crane, because the defendant's confession was the most persuasive evidence of his guilt, and because his interrogation was not recorded by law enforcement officials. Nowhere in the Crane decision, however, is there a suggestion that a defendant should always be allowed to present **expert** testimony to challenge the voluntariness of his confession. In fact, the propriety of expert testimony, on such an issue, is not even discussed in the Crane opinion.

Here, unlike the facts in Crane, the Petitioner was allowed to challenge the voluntariness of her confession, by presenting the Jury with a videotape of her entire interview by Rgnonti. This

videotape accurately depicted the physical environment, and circumstances, that surrounded the Petitioner's confession, and therefore, the Jury was allowed to accurately assess the credibility of the Petitioner's statements during the interview. As such, it appears that the Trial Court's decision to refuse to admit the testimony of Dr. Underwager did not substantively conflict, directly or indirectly, with the holding of the Supreme Court in Crane. Therefore, we conclude that this aspect of the Petitioner's request for Habeas relief is without merit, and we recommend that the Respondent's Motion to Dismiss be granted, thereby dismissing the Petition in its entirety.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Respondent's Motion to Dismiss the Petitioner's Petition for Writ of Habeas Corpus [Docket No. 8] be granted, so that the Petition for Writ of Habeas Corpus [Docket No. 1] is dismissed, with prejudice.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than April 20, 2001,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than April 20, 2001,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.